In re DESKIN LAND TRUST, Debtor.

SHANTY CREEK LODGE ASSOCIATION, INC., a Michigan nonprofit corporation, Plaintiff,

v.

DESKIN LAND TRUST, a trust, Defendant.

Bankruptcy No. NT 84–02202.
Adv. No. 86–0667.

United States Bankruptcy Court,
W.D. Michigan.

May 9, 1988.

Smith, Johnson, Brandt & Heintz, P.C., Donald A. Brandt, Traverse City, Mich., for plaintiff.

Paul I. Bare, Traverse City, Mich., for defendant.

## OPINION

DAVID E. NIMS, Jr., Bankruptcy Judge.

Shanty Creek Lodge Association, Inc. filed a complaint for an order requiring the Deskin Land Trust to convey to it title and ownership, free and clear of any and all liens, of real property commonly known as the "Beach Club," and for damages.

FACTS

*Background*

In the late 1960's, Roy Deskin ("Deskin") was the sole stockholder of General Sheet Steel Company ("General"). About this time, General began developing land it owned in the Shanty Creek resort area near Mancelona, Michigan. With General as its sole stockholder, Shanty Creek Lodge, Inc. ("Shanty Creek") was formed to develop the land. Eventually, although the chronology is unclear, various amenities were constructed on the land, including a lodge, ski slopes, tennis courts, walking trails, and an outdoor swimming pool. Deskin intended to sell vacant lots for residential construction and to operate the lodge as a resort hotel.

In February, 1969, Deskin died leaving as his sole heirs his daughter, Kay Deskin Boone ("Kay"), and his son, Richard R. Deskin ("Richard"). Some thirty years ago, Kay married Daniel M. Boone ("Boone"), a lawyer admitted to the Michigan Bar in 1976. Mr. E. Darrell Dinwiddie ("Dinwiddie"), a Petoskey, Michigan Certified Public Accountant, was appointed executor of Deskin's estate. As such, he elected himself president of both General and Shanty Creek.

In 1970 or 1971, Dinwiddie became aware that property was available adjacent to the land owned by Shanty Creek which would give access to Lake Bellaire. This property would be valuable to Shanty Creek because it would enhance the desirability of both its lots offered for sale and the lodge rooms. Shanty Creek eventually purchased this property, which included the Beach Club.[1] (*See* Exhibit A.) At this time, a clubhouse, or pavilion, and some decrepit cottages were on the Beach Club land, although the cottages have since been torn down over the years. Also, at the time of the purchase of the Beach Club, 25 to 30 of the Shanty Creek lots had been sold while approximately 100 lots remained available.

---

1. Two parcels were purchased at the time the Beach Club was acquired. The Beach Club parcel consisted of three or four acres with a 300-foot frontage on Lake Bellaire west of highway M-88. The other parcel, consisting of some 20 acres east of M-88, is not involved in this proceeding.

*Formation of the Plaintiff*

On May 19, 1972, the plaintiff Shanty Creek Lodge Association, Inc. (the "Association") became a Michigan nonprofit corporation by filing its Articles of Incorporation with the Michigan Department of Commerce. Shanty Creek created this corporation, with Dinwiddie and two others as its incorporators. The purposes of the Association as set forth in the Articles are:

> To promote the welfare of the Corporation's members in matters relating to common areas in the vicinity of the property owned by the members and its maintenance and use by the members, as well as services available for use in common to the members in relation to their property and to do anything necessary or convenient to the owning, operation, management, and control of the real estate and personal property for the common use and benefit of its members, for the installation of utilities [sic] facilities, roadways, and maintenance thereof, and to generally promote and advance the welfare of the membership of the Association in relation to their ownership and use of their property included within the jurisdiction of the Association.

Dinwiddie also served on the Board of Directors of the Association and initially controlled its operations. As lots were sold, the lot owners gradually assumed control pursuant to the bylaws.

The availability of the Beach Club was promoted in sales pitches for the lots. On at least one occasion in 1977, a buyer was told that some day the Beach Club would actually belong to the lot owners. The property owners saw the Beach Club as an integral part of a package and understood it would always be a part of the package. Nothing in the property reports, however, indicated that the Beach Club would be conveyed to the Association. The Beach Club was also used to entice customers to the lodge. Although the ski resort was a part of the lodge business, the summer activities accounted for a greater share of the business.

*Creation of the Defendant*

In 1978, several changes occurred. Shanty Creek sold the lodge, ski slopes, and golf courses to Meeske Enterprises ("Meeske"). On February 17, 1978, an "Agreement and Declaration of Trust" was entered into by General as grantor, Dinwiddie as trustee, Shanty Creek, the Estate of Deskin, and a creditor. The document created a trust known as the Deskin Land Trust (the "Defendant") to develop and market some of the lands not sold to Meeske. According to the agreement, some 1,200 acres were to be transferred by Shanty Creek to the Defendant. Later, this property, including the Beach Club, was conveyed.

Shanty Creek, and later the Defendant, were concerned about the right of the lodge guests to use the Beach Club facilities. On February 13, 1978, the Defendant executed and delivered to Meeske a "Grant of Rights Appurtenant"[2] in which it conveyed to the lodge owners a perpetual right to allow the guests of the lodge to use the Beach Club and other amenities.[3] This document was signed by Dinwiddie as trustee and Boone as a witness. Meeske subsequently sold its interest in the lodge, ski slopes, and golf courses.

*Shanty Creek's Promise*

Shanty Creek was already in great financial difficulty when it purchased the Beach Club. Shanty Creek was continually three years behind in its taxes. It could not insure the buildings at anywhere near their value, nor did it have the money to clean them up. Shanty Creek had hoped that money received from the sale of lots would generate enough income to pay expenses for the upkeep of the Beach Club, but this never happened.

The property owners became upset over the lack of maintenance. Both Shanty

---

**2.** From a review of the documents, it indeed appears that the Defendant granted the appurtenant rights four days before the Defendant was created. No explanation was offered at trial for this discrepancy.

**3.** No one in this proceeding has contested the rights granted under this document.

Creek and the Association were very interested in keeping the Beach Club nice for their members and guests. Therefore, the Association proposed that Shanty Creek deed the Beach Club to them; in return, the Association would maintain the Beach Club. Shanty Creek agreed to deed the Beach Club property to the Association when the existing mortgage was paid.

Dinwiddie, as president of Shanty Creek, and later as trustee of the Defendant, reiterated this promise on several occasions at Association meetings. At this time, Dinwiddie still served on the Board of Directors of the Association, as did Boone, who was present when Dinwiddie made these statements. Boone confirmed that he was aware of Dinwiddie's promise to convey the Beach Club and, although Boone objected privately, he nonetheless felt that it was legally binding. At no time during this period did anyone else object to Dinwiddie's offer to deed the property. Shanty Creek originally had not intended to convey the Beach Club to the Association, but eventually the Defendant realized that this was the only feasible alternative. The Defendant's financial condition made it impossible to carry out its promises—the Beach Club had become a burden to the Defendant.

Shanty Creek and the Defendant, acting through Dinwiddie, always intended to deed the property as soon as the mortgage was paid. Although Dinwiddie is certain that a letter was sent confirming the agreement of the Defendant to convey title to the Association, such a letter could not be found among the records. However, Dinwiddie sent a reply letter dated March 21, 1983 to William Hammond, president of the Association, which discussed the property and stated in part:

6. No representations have ever been made to the Property Owners Association other than that the Beach Club would be deeded to the Property Owners Association when paid for. This representation was reduced to writing at some time in the past; however, I do not find a copy of that letter which was addressed to the Property Owners Association. I have no objection to the execution of such a document.

7. The Deskin Land Trust has retained no rights to establish and collect fees for the Beach Club, etc. All of these rights were conveyed to the Property Owners Association several years ago because of the concern of the Association as to its participation in the entire project. I am sure that Mr. Daniel Boone can tell you how this transfer of rights was legally accomplished.

The Deskin Land Trust would certainly be willing to convey the ownership of the Beach Club property to the Property Owners Association immediately subject, of course, to the existing mortgage and taxes, together with an acceptance by the Property Owners Association of all rights of usage previously conveyed by the Deskin Land Trust, together with an acceptance by the Property Owners Association of the requirement for membership for the twelve additional lots to be developed by the Deskin Land Trust.

A more recent communication from you indicated that you had been unable to reach an amicable solution with the Condominium Associations as to the "reasonable charge" to be made for 1983 Beach Club usage. My only suggestion to you is that the Property Owners Association has the right to determine what the "reasonable charge" is and, if not acceptable or negotiable with the condominium owners, it would seem that your recourse would be to deny such usage.

*The Association's Reliance*

Although the Beach Club had not yet been conveyed, the Association assumed management of it in reliance on the promises to deed the property. After the Association assumed operation of the Beach Club, it paid the taxes, insurance, and utilities. The Beach Club has since been well maintained. The Association cleaned up the buildings and premises, provided lifeguard services, built docks, cut the grass, performed maintenance work on the buildings, and annually brought in sand to re-

plenish the beach. Generally, about $10,-000 a year, representing approximately eighty percent of the annual budget of the Association, was spent on the Beach Club.

By 1986 the Association's membership included 247 lot owners. Approximately twenty-two homes have been built, not including some new homes built in the fall of 1986. Additionally, thirteen to fifteen condominium associations have been formed comprised of an estimated 800 to 900 condominium owners. Both lot owners and condominium owners pay dues which are used by the Association to pay all its expenses. The condominium owners have full use of the Beach Club. Whether condominium owners are members of the Association is not clear, but at least at present the bylaws do not authorize them to sit on the Board of Directors. A count has indicated that the Beach Club is used by the equivalent of approximately 4000 daily users per year, which can be roughly apportioned equally between the lot owners, condominium owners, and guests of the lodge.

The Association has spent $110,000 on the Beach Club in the past 10 years. The bylaws of the Association only allow expenditures on property owned by it. The Board of Directors has only authorized the expenditure of these funds with the understanding that the Beach Club would be deeded to the Association. The mortgage on the Beach Club property has been paid off.

*The Controversy*

In 1984, Boone, acting for Kay and Richard, had Dinwiddie removed as Executor of the Deskin estate and as trustee of the Defendant. Boone succeeded Dinwiddie as trustee of the Defendant. In 1986, Boone found the Defendant to be "grossly insolvent" and filed a voluntary Chapter 11 petition under the Bankruptcy Code on its behalf.

The only indication of a possible disposition of the Beach Club under the Defendant's confirmed plan is to sell it for the benefit of creditors. Boone concedes that presently the only likely purchasers would be the Association or one or more of the condominium associations. The Association has expressed the fear that if the Defendant retains title to the Beach Club, it might sell to an outsider. Under this scenario, the members' property values would likely decline. The Association would not only lose its access to the Beach Club, but would also suffer from the increased congestion created by the "funnel" effect of traffic within the Shanty Creek area.

## DISCUSSION

*Statute of Frauds*

The Defendant claims that the Statute of Frauds requires any contract for the sale of real property to be in writing and signed by the seller. Except for provisions not material to this proceeding, the Michigan Statute of Frauds provides in part as follows:

> Every contract for the leasing for a longer period than one (1) year, or for the sale of any lands, or any interest in lands, shall be void, unless the contract, or some note or memorandum thereof be in writing, and signed by the party by whom the lease or sale is to be made, or by some person thereunto by him lawfully authorized in writing....

Mich.Comp.Laws § 566.108 (1967) (Mich. Stat.Ann. § 26.908 (Callaghan 1987)). Since no such contract exists in this case, the Defendant argues that the Association cannot prevail.

In a recent case before the Michigan Supreme Court, *Opdyke Inv. Co. v. Norris Grain Co.*, 413 Mich. 354, 320 N.W.2d 836 (1982), suit was brought for damages caused by a claimed contract to develop a new sports arena. The trial court granted the defendant's motion for accelerated and summary judgments, and the court of appeals affirmed. The terms of the agreement were embodied in a "Letter of Intent". The lower courts held that the letter was "not intended to be a binding contract but operated only as an unenforceable agreement to agree." *Id.* at 358, 320 N.W. 2d at 839 (citing 94 Mich.App. 770, 774, 288 N.W.2d 362, 362 (1979)). Before the Michi-

gan Supreme Court reversed and remanded the proceedings to the trial court for proceedings consistent with its opinion, it discussed the present-day status of the Statute of Frauds:

The Statute of Frauds has enjoyed a position of prominence in Anglo–American jurisprudence for three centuries and has proven durably resistant to continuing scholarly criticism. The statute remains firmly entrenched in our law despite its repeal in England, the jurisdiction of its birth, in 1956. Forty-nine states retain the statute. Louisiana, with its French civil-law heritage, is the exception. Even the modern Uniform Commercial Code includes a modified statute of frauds. UCC 2–201; MCL 440.2201; MSA 19.2201.

While the form of the statute has remained essentially unchanged over the centuries, judicial interpretation has undergone considerable evolution. The doctrine of "past performance" satisfying the statute is as old as the statute itself; estoppel and promissory estoppel have developed to avoid the arbitrary and unjust results required by an overly mechanistic application of the rule. It has been suggested that if the statute lacked such equitable "loopholes", the outcry would soon be such that amendments would be passed in short order.

. . . .

Certainly nothing in the language of the statute requires adherence to the strict "nothing in parol" rule suggested in *Gedvick, supra* [53 N.W.2d 583]. The statute does not require the entire contract to be written; a "note or memorandum" of the full contract will suffice. See *Kerner v Hughes Tool Co,* 56 Cal App3d 924; 128 CalRptr 839 (1976). Perhaps the "nothing in parol" notion resulted from combining the statute of frauds with the so-called "parol evidence rule", or rule against contradicting integrated writings. See *NAG Enterprises, Inc v All State Industries, Inc,* 407 Mich 407; 285 NW2d 770 (1979), *reh den* 407 Mich 1164 (1980); *Union Oil Co of California v Newton,* 397 Mich 486; 245 NW2d 11 (1976). In any event, the "nothing in

parol" approach to the statute of frauds has been so dishonored in this Court that it has lost any claim to legitimacy. *Wozniak v Kuszinski,* 352 Mich 431; 90 NW2d 456 (1958); *Farah v Nickola,* 352 Mich 513; 90 NW2d 464 (1958); *Cramer v Ballard,* 315 Mich 496; 24 NW2d 80 (1946); *Goslin v Goslin,* 369 Mich 372; 120 NW2d 242 (1963); *Duke v Miller,* 355 Mich 540; 94 NW2d 819 (1959); *Goldberg v Mitchell,* 318 Mich 281; 28 NW2d 118 (1947); *Randazzo,* [127 N.W. 2d 880] *supra.* The foregoing cases establish the principle that extrinsic evidence may be used to supplement, but not contradict, the terms of the written agreement. In the absence of extrinsic supplemental evidence, the court may infer that the parties intended a "reasonable" or "good faith" term as part of the contract.

We decline to accept the defendants' invitation to adopt narrow and rigid rules for compliance with the statute of frauds. Instead, we affirm the standard espoused by Professor Corbin and adopted by this Court in *Goslin v Goslin, supra,* 369 Mich [at] 376 [120 N.W.2d 242]:

" 'Let us proceed, therefore, with a general consideration of what constitutes a sufficient note or memorandum. We may well start with this one general doctrine: There are few, if any, specific and uniform requirements. The statute itself prescribes none; and a study of the existing thousands of cases does not justify us in asserting their existence. Some note or memorandum having substantial probative value in establishing the contract must exist; but its sufficiency in attaining the purpose of the statute depends in each case upon the setting in which it is found. * * * That is the rule of law to be applied with intelligence and discrimination and not like a pedant playing a game of logomachy.' "

*Id.* at 364–68, 320 N.W.2d at 840–42.

I cannot agree with the Defendant that no "memorandum ... in writing" exists.

Mich.Comp.Laws § 566.108 (1967) (Mich. Stat.Ann. § 26.908 (Callaghan 1987)). The letter of Dinwiddie, then trustee of the Defendant, is a clear and unambiguous statement of the Defendant's intent. Thus, I find that the Statute of Frauds has been satisfied.

*Estoppel*

■ Even if the Statute of Frauds requirement were not met, I would still find that there is a binding agreement requiring the Defendant to convey the Beach Club to the Association. Over the many years in which the Statute of Frauds has been in effect in Anglo–American law its severe effect has gradually diminished. "In Michigan, courts apply equitable estoppel liberally to avoid an unjust result when a party has detrimentally relied on an oral contract, even absent any misrepresentation." Hipp, *Contracts, 1979 Ann. Survey of Michigan Law,* 26 Wayne L.Rev. 543, 550 (1980).

In *Conel Dev., Inc. v. River Rouge Sav. Bank,* 84 Mich.App. 415, 269 N.W.2d 621 (1978), *lv. app. den.,* 406 Mich. 910 (1979), the plaintiff sued River Rouge Savings Bank and others for damages for breach of contract to construct roads, install underground drainage lines, and make other improvements in developing a living site. The bank claimed *inter alia* that the Statute of Frauds required that a written promise to answer for the debt or default of another must be supported by a written agreement. *See* Mich.Comp.Laws 566.132 (1987) (Mich.Stat.Ann § 26.922 (Callaghan 1982)). A jury found for the plaintiff and against the bank. In affirming, the Michigan Court of Appeals stated:

MCL 566.132(2); MSA 26.922(2) requires that every agreement to answer for the debt or default of another be in writing and signed by the party to be charged. The only writing in the within case evidencing a promise by the defendant bank was an introductory letter given by defendant bank to UTV president Brewer vouching for Brewer's character and integrity. Defendant RRSB argues that this letter alone can not [sic] satisfy

the statute of frauds requirement for a surety arrangement.

To overcome the statute of frauds defense, plaintiff relies on an estoppel theory. Estoppel arises where a party, by representations, admissions or silence, intentionally or negligently induces another party to believe facts, and the other party justifiably relies and acts on this belief, and will be prejudiced if the first party is permitted to deny the existence of the facts. Where a plaintiff alleges estoppel to circumvent the statute of frauds, a question of fact is raised which must be resolved at trial by the trier of fact. The question on review becomes: Was there sufficient evidence, which, if believed by the trier of fact, would support a finding of estoppel sufficient to circumvent the statute of frauds?

84 Mich.App. at 422–23, 269 N.W.2d at 625 (footnotes omitted).

As the court explained in *Conel Development,* the elements of an equitable estoppel are a representation which induces another to justifiably rely on it to his detriment if the one making the representation is now permitted to deny it. In the present case, the Defendant held out the availability of the Beach Club as an enticement to the eventual Association members to purchase their lots. The Defendant represented that the Beach Club would be deeded to the Association when the mortgage was paid off. All parties knew of this representation. Dinwiddie, the Defendant's former trustee, wrote an unambiguous letter expressing this intent. Even Boone, the present trustee, who now resists complying with that intent, has testified that he knew of it and apparently concurred in the parties' understanding of the agreement at the time.

The Association has expended thousands of dollars in reliance upon the representations that the Beach Club would eventually be conveyed to it. Should the Defendant now be permitted to rescind its representation, the Association will have lost this money and may at best have an unsecured claim against the debtor. Moreover, if the Defendant is allowed to repudiate its prom-

ise, the Association members will lose the guaranteed access to the Beach Club upon which they relied in making their lot purchases. Therefore, the requisite detrimental reliance necessary for the invocation of the doctrine of equitable estoppel has been shown.

## CONCLUSION

Here we not only have a clear "memorandum", but also a classic textbook case for imposing the equitable doctrine of estoppel. The availability of the Beach Club was held out to purchasers of vacant lots as an important inducement for their purchase. Furthermore, the Association has expended thousands of dollars in reliance on the promise to convey the property.

Therefore, the Defendant will convey the Beach Club property to the Association, subject to such rights to use the premises as have been conveyed to the present owners of the lodge and the condominium owners or their associations. If any problems arise in resolving the respective rights of the Association, condominium owners, or the lodge, application can be made to this court or any other appropriate court.

In the absence of such a conveyance, a copy of the Order based on this Opinion, together with an attached legal description of the property, may be recorded in the appropriate Register of Deeds Office in lieu of such deed.

No damages or costs are allowed.

Exhibit A

IRONWOOD

TIMBER RIDGE
TRAPPERS LODGE
TRAPPERS LODGE
GOLF PRO SHOP
TIMBERLINE
MAIN LODGE
WIND CLIFF
SUMMIT CENTER
SAWTOOTH
RIDGEWALK
VALLEY VIEW
SNOWSHOE
NORTH CROSSOVER DRIVE
POND
POINTS WEST

ONE MILE

SHANTY CREEK ROAD

To Bellaire

BEACH CLUB